**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOHNNY DAVID HARRIS,**

   **Plaintiff,**

**v.**            **Case No.: 3:11-cv-0108**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

   **Defendant.**

## MEMORANDUM OPINION

   This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 10 and 16). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 11 and 12). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I. Procedural History

   Plaintiff, Johnny David Harris (hereinafter referred to as "Claimant"), filed for DIB and SSI benefits on October 9, 2007, alleging disability due to chronic back, leg, and hip

pain; depression and anxiety; high blood pressure; high cholesterol; incontinence; high blood sugar; and gastroesophageal reflux disease ("GERD").[1] (Tr. at 119–23). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 79–86). On May 2, 2008, Claimant filed a written request for a hearing before an Administrative Law Judge ("ALJ"). The administrative hearing was held on March 25, 2009 before the Honorable Charlie Andrus. (Tr. at 24–45). By decision dated June 23, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11–23).

The ALJ's decision became the final decision of the Commissioner on January 9, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 6–8). On February 15, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on June 2, 2011. (Docket Nos. 7 and 8). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (Docket Nos. 10 and 16). Therefore, this matter is ripe for resolution.

## II.  Claimant's Background

Claimant was 31 years old at the time of his alleged disability onset. (Tr. at 22). Claimant has a high school education and is able to communicate in English. (Tr. at 30). He previously worked as a truck driver and laborer. (*Id.*).

## III.  Relevant Medical Records

The Court has reviewed the Transcript of Proceedings in its entirety, including

---

[1] Claimant filed prior applications for DIB and SSI benefits on March 17, 2005, alleging disability since October 31, 2003. These claims were denied by the SSA initially on May 27, 2005 and on reconsideration on November 18, 2005. After an administrative hearing, an ALJ issued an unfavorable decision on March 6, 2007. Thereafter, the Appeals Council denied Claimant's request for review. Claimant brought an action in the United States District Court for the Southern District of West Virginia challenging the Commissioner's decision. The Commissioner's decision was affirmed. Accordingly, the ALJ's decision was *res judicata* for the period ending March 6, 2007.

the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.   October 31, 2003 to March 6, 2007

On October 31, 2003, Claimant injured his back while working as a truck driver for a sanitation company. Claimant began receiving medical treatment for lower back pain, right hip pain, and right leg pain. At his initial examination, Claimant exhibited signs of vertebral tenderness, sacral base and pelvis level pain, paraspinal tenderness, and sacroiliac ("SI") joint tenderness on the right side. After filing a Workers' Compensation claim, Claimant received a variety of rehabilitative services to assist him in returning to work. In the spring and summer of 2004, Claimant's treating physicians disagreed with state agency physicians over whether Claimant had reached maximum medical improvement and whether Claimant was able to return to work. After participating in a work conditioning program, Claimant was cleared for light work, which his former employer could not accommodate.

Claimant's treating physician, Ahmet Ozturk, MD of Cabell Huntington Pain Management Center, diagnosed Claimant with a lumbar strain/sprain, myofascial pain syndrome, and SI joint syndrome and worked to alleviate Claimant's pain symptoms. Over the course of 2004 and 2005, Claimant's complaints of pain intensified. In November 2005, Claimant began mental health treatment. He reported experiencing problems with his family and struggling with financial difficulties. Claimant also stated that he experienced suicidal ideation but had no intent to follow through on those thoughts. Consequently, Claimant was diagnosed with major depression and anxiety.

In 2006 and early 2007, Claimant continued a regular schedule of doctor's

appointments to address his back, leg, and hip pain and continued to receive mental health counseling. Dr. Ozturk repeatedly sought authorization from the Workers' Compensation Division to use spinal cord stimulation to alleviate Claimant's back pain, but was denied each time. Claimant described his back pain throughout this period of time as severe. Claimant continued to experience symptoms of depression and anxiety due to his financial difficulties and separation from his wife.

### B.    Relevant Time Period

On March 21, 2007, Claimant returned for a follow-up appointment with Dr. Ozturk. (Tr. at 489–93). Claimant complained of increased pain in his right lower back and right hip. (Tr. at 489). Otherwise, Dr. Ozturk noted no significant changes and continued to seek authorization for radiofrequency treatment of Claimant's right SI joint, SI joint injections, and spinal cord stimulation. (Tr. at 492).

On April 24, 2007, Claimant returned for a regular appointment with Dr. Ozturk. (Tr. at 484–88). Claimant reported that his right leg had started to go numb and give out intermittently. (Tr. at 484). According to Claimant, this had been ongoing for the previous two months. (*Id.*). Dr. Ozturk noted no other significant changes. On May 8, 2007, Claimant presented to Ebenezer Medical Outreach for a regular appointment. (Tr. at 391). Claimant stated that he was experiencing pain and numbness in his legs as a result of problems with his back. (*Id.*). Claimant further stated that he wanted to return to work at a job with a salary comparable to that of his previous job. (*Id.*). A follow-up appointment with Dr. Ozturk on June 20, 2007 revealed no significant changes in Claimant's health. (Tr. at 479–83). Dr. Ozturk again stated that he was pursuing authorization for radiofrequency of Claimant's right SI joint and expressed intent to send Claimant to case management "to see what we can do to get him back to work, as

he continues to be off work." (Tr. at 481).

On July 24, 2007, Claimant was examined by Dr. Ozturk and described attempting to increase exercising by walking a quarter of a mile every day. (Tr. at 475–78). Claimant did state that this increase in activity resulted in more pain in his right hip and right leg. (Tr. at 476). On November 8, 2007, Claimant reported that he continued to experience severe pain in his lower back, right hip, and right leg. (Tr. at 470–74). Claimant reported feeling useless and experiencing thoughts of suicide on a regular basis. (Tr. at 471). Dr. Ozturk noted that Claimant did not have insurance but recommended that Claimant return to Ebenezer to begin treatment with a psychologist or psychiatrist there. (Tr. at 472).

On November 21, 2007, Claimant began mental health treatment with Jack Williams, MA, at Prestera Mental Health Center ("Prestera"). (Tr. at 592–601). Mr. Williams noted that Claimant exhibited signs of severe suicidal behavior, self-injury, withdrawal, poor judgment, poor concentration, depression, guilt, anxiety, low energy, and loss of interest in activities. (Tr. at 593–94). Claimant also exhibited signs of moderate hostility, paranoia, distractibility, and mild agitation. (*Id.*). Mr. Williams reviewed Claimant's medication and found that Claimant's medication was not effective and needed to be changed. (Tr. at 596). Claimant was diagnosed as suffering from recurrent major depressive disorder. (Tr. at 598). Mr. Williams described Claimant's clinical stability:

> [Claimant] says that he feels like there is nothing to live for. He says that he went onto a bridge within the last two weeks with the intent of jumping off to commit suicide. When I asked what prevented him from jumping; he responded, "the thought of my children." I asked him if he still felt like he was going to attempt suicide again; he responded, "I don't know." I asked him if he would consider placing himself in the hospital so the doctors could help him get stabilized[.] He refused.

(Tr. at 600).

Claimant's appointment with Dr. Ozturk on November 27, 2007 revealed no significant changes in Claimant's physical health. (Tr. at 466–69). Claimant reported that he was not feeling as depressed and his suicidal ideation was minimal. (Tr. at 467). On December 10, 2007, a staff psychiatrist at Prestera completed an initial psychiatric evaluation of Claimant. (Tr. at 590–91). The psychiatrist reviewed Claimant's history of depression, noting that Claimant's back injury exacerbated his depression because he was unable to play with his children and could not work to provide for them. (Tr. at 590). Claimant stated that he did not go fishing anymore due to a lack of interest and was overeating and did not sleep well. (*Id.*). Claimant's Global Assessment of Functioning ("GAF")[2] was 50 and his prognosis was fair due to his back pain and financial problems. (Tr. at 591).

On December 12, 2007, Claimant returned to Prestera for an appointment with Mr. Williams. (Tr. at 588–89). Claimant reported feeling depressed because he was no longer able to provide for his children. (Tr. at 588). Mr. Williams noted that Claimant's back injury and financial problems were the two main obstacles to Claimant's mental health progress. (*Id.*). At Claimant's appointment with Mr. Williams on December 20, 2007, Claimant reported that he was feeling much better and that his new prescription[3] was very helpful. (Tr. at 586–87). On January 9, 2008, Claimant was seen by Mr. Williams at Prestera. (Tr. at 583–84). Claimant reported that his depression had

---

[2] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100.  This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision*. A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

[3] It is unclear from the record what Claimant's new prescription was or when he began taking it.

worsened since his last visit because his wife was denying him visitation with his children and his SSI application was denied. (Tr. at 583). Claimant stated that he was having thoughts of suicide but had no intention to act on them. (*Id.*).

On January 14, 2008, Claimant began treatment with David Whitmore, DO. (Tr. at 641). Claimant reported no particular complaints; Dr. Whitmore noted Claimant's history of chronic back pain, depression, and anxiety. (*Id.*). On January 16, 2008, Claimant was seen by Mr. Williams at Prestera. (Tr. at 581–82). Claimant reported that he was feeling less depressed and that when he did feel depressed, it was less intense and for shorter periods of time. (Tr. at 581). Claimant also stated that he was sleeping better; once his back problems were resolved, Claimant and Mr. Williams agreed that any lingering problems with his sleep and depression would likely resolve. (*Id.*).

On January 22, 2008, Dr. Ozturk drafted a letter to the West Virginia Department of Health and Human Resources ("DHHR"), in which he stated that Claimant was unable to return to work at that time. (Tr. at 461). Dr. Ozturk stated that he would continue to monitor Claimant on a monthly basis, but did not have a projected return to work date for Claimant. (*Id.*). That same day, Dr. Ozturk examined Claimant and recorded new complaints of pain in his left leg. (Tr. at 462–65). According to Claimant, he was experiencing intermittent sharp pain in his left leg that was not constant like his right leg. (Tr. at 463). Claimant informed Dr. Ozturk that he had begun taking new medication for his depression.  He did not feel the new medication alleviated his depression, but reported no suicidal ideation. (*Id.*). Dr. Ozturk stated that he would like Claimant to return to work and would request vocational rehabilitation. (Tr. at 464).

On February 14, 2008, Claimant completed an Adult Function Report at the request of the Social Security Administration. (Tr. at 567–74). Claimant reported that he

was unable to sit or stand for more than ten to fifteen minutes at a time. (Tr. at 567). Consequently, he was unable to perform any activities that he previously enjoyed. (*Id.*). He also noted that he had difficulty sleeping because of his chronic pain. (*Id.*). Claimant stated that he did not provide care for any family members or pets and that his mother cared for him and his children when they visited. (Tr. at 568). Claimant reported that his chronic pain was unbearable when trying to sleep and that he was unable to get comfortable. (*Id.*). He described difficulty with personal care and struggled with remembering to take his medicines without a reminder from others. (Tr. at 568–69). Due to his inability to stand or bend over, Claimant stated that he did not cook or perform chores. (Tr. at 569–70). He went outside two to three time a week to walk on the porch and that he was able to drive a car or ride in a car. (Tr. at 570). According to Claimant, he often had to stop and get out of the car intermittently to relieve the pain he experienced while sitting. (*Id.*). Claimant was able to pay bills, count change, handle a savings account, and use a checkbook although he had difficulty filling out checks. (*Id.*). In terms of hobbies and interests, Claimant stated that he read and watched television but that he was unable to hunt or fish like he used to prior to his injury. (Tr. at 571). Claimant reported being unable to concentrate on simple tasks as a result of the constant pain. (*Id.*). Claimant engaged in social activities on a daily basis with family but was unable to go out often because of the pain. (*Id.*).

Claimant reported difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding and following instructions, and getting along with others due to his chronic pain and depression. (Tr. at 572). According to Claimant, he could walk for a quarter of a block at most and needed to rest for ten to fifteen minutes before he

resumed walking. (*Id.*). Claimant stated that he often had difficulty following written instructions and would need verbal instructions to be explained in detail to him. (*Id.*). Claimant also stated that he had anger management issues and that he had previously tried to kill himself and thought about suicide occasionally. (Tr. at 573).

On February 15, 2008, Claimant was seen by Mr. Williams at Prestera. (Tr. at 576–77). Claimant stated that he was continuing to have suicidal ideation but that he had no intent of acting on these thoughts. (Tr. at 576). Mr. Williams expressed concern over these thoughts and encouraged Claimant to seek help from an inpatient crisis unit. (*Id.*). Claimant was seen again at Prestera on February 21, 2008 and reported feeling continuously depressed and unmotivated to do anything. (Tr. at 670). Claimant stated that he was unable to sleep more than four hours per night. (*Id.*). His GAF was 55.[4]

On March 14, 2008, an unknown treating source at Pain Care PLLC completed a routine abstract form-physical. (Tr. at 602–06). The treating source found that Claimant's gait and station were abnormal due to an antalgic gait and difficulty walking heel to toe. (Tr. at 603). Claimant's senses and motor strength were found to be normal. (Tr. at 604). The treating source diagnosed Claimant with SI joint syndrome, myofascial pain syndrome, and lumbar radiculopathy. (Tr. at 605). On March 25, 2008, Claimant was seen by Dr. Ozturk with continuing complaints of chronic pain. (Tr. at 657–61). Claimant stated that his pain level was unchanged but that psychologically he was feeling better since he started seeing Mr. Williams. (Tr. at 658). Dr. Ozturk noted that Claimant had reached maximum medical improvement and was waiting to see if Claimant would be approved for vocational rehabilitation. (Tr. at 659). On April 17, 2008, Claimant was seen at Prestera by Nika Razavipour, MD, for follow-up treatment.

---

[4] A score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning.

(Tr. at 669). Claimant reported that he was feeling better since changing medications and that he was able to sleep seven to eight hours a night when taking trazedone. (*Id.*). Claimant reported feeling motivated and that he was enjoying his daily routine more. (*Id.*). Dr. Razavipour assessed Claimant's GAF as 65.[5]

On July 14, 2008, Claimant was seen at Prestera Mental Health Center by Dr. Razavipour. (Tr. at 668). Claimant stated that he was doing well and was able to sleep "okay." (*Id.*). On October 6, 2008, Claimant returned to Prestera for a follow-up appointment with Dr. Razavipour and reported that he was doing "fine." (Tr. at 667). His GAF was 60. On October 29, 2008, Claimant was seen by Dr. Ozturk with new complaints of neck pain. (Tr. at 652–56). Claimant's pain symptoms were otherwise consistent with previous evaluations. Claimant was subsequently seen by Dr. Ozturk again on February 5, 2009, complaining of lower back pain and pain in his right hip, leg, and foot. (Tr. at 648). No significant changes were otherwise noted. (Tr. at 650). Dr. Ozturk proposed performing an SI nerve block and then proceeding with a radiofrequency exam of Claimant's SI joints. (*Id.*). Claimant was seen at Prestera on February 12, 2009 by Dr. Razavipour and reported feeling good. (Tr. at 666). Claimant stated that he had not been feeling depressed and that he believed the medication was helping him. (*Id.*). According to Claimant, he was able to sleep about seven hours a night on trazedone. (*Id.*).

On March 12, 2009, Dr. Razavipour at Prestera completed a mental status statement regarding Claimant's ability to do work-related activities. (Tr. at 662–65). Dr. Razavipour concluded that Claimant's mental impairments were severe. (Tr. at 662). If Claimant could obtain better treatment of his physical pain, Dr. Razavipour believed

---

[5] A GAF of 61-70 indicates the presence of some mild symptoms, but the client is generally functioning pretty well and has some meaningful interpersonal relationships.

that his mental impairments would improve. (*Id.*). Dr. Razavipour did not fully address Claimant's function-by-function limitations in the form, but did note certain moderate and severe limitations. He found Claimant's ability to respond appropriately to usual work situations and to change in a routine work setting to be extremely[6] limited and his symptoms in the following areas to be extreme: pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; feelings of guilt or worthlessness; mood disturbance; and sleep disturbance. (Tr. at 663–64.). Dr. Razavipour also found that Claimant's thoughts of suicide and difficulty thinking or concentrating were moderate[7] in nature. (Tr. at 663). Based on Claimant's limitations, Dr. Razavipour concluded that Claimant would likely be absent from work at least five days a month. (Tr. at 664). Dr. Razavipour reiterated his belief that treatment of Claimant's back pain would positively impact his mental health treatment. (Tr. at 665).

### C.    Agency Assessments

1.    *Physical Assessments*

On November 26, 2007, Drew Apgar, D.O., completed a disability evaluation at the request of the West Virginia Disability Determination Section. (Tr. at 435–54). Dr. Apgar reviewed Claimant's medical records from Ebenezer Medical Outreach and the Pain Management Center at Cabell Huntington Hospital. (Tr. at 435). Claimant's disability request was based on chronic pain – back, right hip, and right leg; hyperlipidemia; incontinence; hyperglycemia; GERD; depression; and anxiety. (Tr. at 436). Claimant's daily activities included watching television, reading occasionally, and "a little walking." (Tr. at 438). Claimant also reported fishing and hunting as his hobbies

---

[6] In the form used by Dr. Razavipour, "extreme" is defined as a "major limitation and no useful ability to function in this area."

[7] In the form used by Dr. Razavipour, "moderate" is defined as "more than slight limitations, but the individual is still able to function satisfactorily."

he enjoyed. (*Id.*). Dr. Apgar noted that Claimant experienced difficulty getting on and off the examination table; that Claimant moved around the room with difficulty; and that Claimant experienced difficulty dressing and undressing. (Tr. at 440). Dr. Apgar found that Claimant suffered from chronic pain syndrome, specifically in Claimant's lumbar spine with radiculopathy in Claimant's right hip and leg. (Tr. at 446). Dr. Apgar also diagnosed Claimant with depression and anxiety based on a review of Claimant's medical records. (*Id.*).

Dr. Apgar's physical examination found Claimant's motor strength and grasp to be intact. (Tr. at 447). Although Claimant had significant limitations in his range of motion, Dr. Apgar found that he could sit comfortably. (*Id.*). Dr. Apgar found no joint abnormalities in Claimant's hips and noted that Claimant's gait was "steady, deliberate and not fully weight-bearing." (*Id.*). Claimant could walk without an assistive device and his gait was antalgic. (*Id.*). Claimant was able to drive to and from the examination site. (*Id.*). Dr. Apgar subsequently evaluated Claimant's mental health; Claimant reported being depressed but did not admit to suicidal ideation. (Tr. at 448).

Based on his findings, Dr. Apgar found that Claimant could handle objects, hear, and speak without difficulty. (*Id.*). Dr. Apgar noted that Claimant experienced some difficulty with standing, walking, sitting, lifting, carrying, pushing pulling, and traveling. (*Id.*). Dr. Apgar was unable to reconcile conflicting results during the range of motion tests; Claimant was able to sit fully upright with no apparent distress but evidenced limited range of motion in the hips and spine during other tests. (*Id.*). Dr. Apgar found that Claimant's effort was satisfactory and the test results therefore reliable. (*Id.*). Despite Claimant's past mental health history, Dr. Apgar opined that his mental status was "essentially normal." (*Id.*).

On April 21, 2008, Raymond Lim, MD, completed a Case Analysis at the request of the Social Security Administration. (Tr. at 625). Dr. Lim found that x-rays and MRIs revealed some degenerative changes and facet arthropathy in Claimant's lumbosacral spine without other significant findings and his physical examinations showed only a right antalgic gait, somewhat limited range of motion, and no significant abnormal neurological findings. (Tr. at 625). Dr. Lim pointed out that at least two different medical sources felt Claimant's symptoms and limitations were not consistent or corroborated by the evidence. (*Id.*). Therefore, Dr. Lim concluded that the ALJ's finding in March 2007 that Claimant could perform light exertional level work was still supported by a preponderance of the evidence. (*Id.*).

    2.    *Mental Health Assessments*

On November 28, 2007, Lisa Tate, MA, Licensed Psychologist, completed a psychological evaluation at the request of the West Virginia Disability Determination Section. (Tr. at 455–59). As part of her report, Ms. Tate completed a clinical interview and mental status examination. (Tr. at 455). Claimant was driven to the interview by his mother. (*Id.*). Claimant described the onset of his depression and anxiety in the months following his injury in October 2003 and stated that his depression had become progressively worse over the past four years. (Tr. at 456). Ms. Tate found that Claimant's orientation, thought processes, thought content, perception, insight, judgment memory, recent memory, remote memory, concentration, and psychomotor behavior were all within normal limits. (Tr. at 457–58). Ms. Tate concluded that Claimant's mood was depressed and his affect was mildly restricted. (Tr. at 457). Claimant denied suicidal ideation but did report that a week earlier he had walked to bridge and considered jumping. (Tr. at 458). Claimant was diagnosed as suffering from a single severe episode

of major depressive disorder and generalized anxiety disorder. (*Id.*).

Ms. Tate then reviewed Claimant's daily activities. Claimant reported that he had no set sleep schedule. (*Id.*). During the day, he reported showering, watching television, going out on his porch, and trying to walk around on the porch. (*Id.*). Claimant denied doing any household chores. (*Id.*). Claimant's weekly activities included taking a short walk every other day, attending church, spending two evenings per week with his children, and taking care of his children every other weekend. (*Id.*). Claimant's monthly activities included eating out with his parents, going to the grocery store with his parents, and going to doctors' appointments. (Tr. at 459). Claimant reported no hobbies or interests. (*Id.*). Ms. Tate found that Claimant's social functioning, concentration, persistence, and pace were all within normal limits. (*Id.*).

On April 17, 2008, Timothy Saar, Ph.D, completed a Psychiatric Review Technique at the request of the Social Security Administration. (Tr. at 610–23). Dr. Saar found that Claimant suffered from an affective and anxiety-related disorder, but that Claimant's mental impairments were not severe. (Tr. at 610). Dr. Saar concluded that Claimant suffered from major depression and anxiety disorder. (Tr. at 613–15). Dr. Saar evaluated Claimant's functional limitations and found that Claimant's functional limitations were all mild and that Claimant had experienced no episodes of extended decompensation. (Tr. at 620). Further, Dr. Saar found that the evidence did not establish the presence of the Paragraph "C" criteria. (Tr. at 621). Dr. Saar ultimately found that Claimant was not fully credible and that the medical record did not support Claimant's disability claim. (Tr. at 622). Claimant could manage basic activities of daily living and social interactions with mild limitations. (*Id.*). Consequently, Claimant's mental health issues did not rise to the level of a severe impairment. (*Id.*).

## IV.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case

of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about

the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § C.F.R. § 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through March 31, 2009. (Tr. at 16, Finding No. 1). The ALJ then determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since March 7, 2007, one day after the prior ALJ's decision.[8] (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of vertebrogenic disorder and obesity. (Tr. at 17, Finding No. 3). The ALJ considered Claimant's history of depression and anxiety but found these medical impairments to be non-severe. (Tr. at 17–18).

---

[8] Claimant's first application for SSI and DIB benefits alleged a disability onset date of October 31, 2003, and was denied by ALJ James Kemper, Jr., on March 6, 2007. (Tr. at 14). At the time of the ALJ's decision in this case, Claimant's civil complaint was still pending before the district court. Therefore, the ALJ considered Claimant's disability claim from March 7, 2007 to March 31, 2009.

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 18, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform light work . . . except he should have an option to sit or stand at 30 minute intervals. He can only occasionally climb, balance, stoop, crouch, kneel, or crawl and should not work at heights or around dangerous machinery. He should not subject his body to vibration.

(*Id.*, Finding No. 5).

As a result, Claimant could not return to his past relevant employment. (Tr. at 22, Finding No. 6). The ALJ noted that Claimant was 31 years old at the time of the alleged disability onset date, which qualified him as a "younger individual age 18-49." (*Id.*, Finding No. 7). He had a high school education and could communicate in English. (*Id.*, Finding No. 8). The ALJ found that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 9). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform jobs at the light exertional level; such as, production inspector, office helper, assembler, and information clerk, all of which existed in significant numbers in the national and regional economy. (Tr. at 22–23, Finding No. 10). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 23, Finding No. 11).

## V.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to properly consider the opinions of Claimant's treating physicians. (Pl.'s Br. at 7–8). Second, Claimant contends that the ALJ's hypothetical

question to the vocational expert was improper. (Pl.'s Br. at 9).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered each of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court

concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

### A.   **ALJ's Consideration of the Opinions of Treating Sources**

Claimant contends that the ALJ failed to properly consider the opinions of Dr. Ozturk and Dr. Razavipour. Specifically, Claimant alleges that the ALJ did not adequately address Dr. Ozturk's January 22, 2008 letter in which he opined that Claimant was unable to work at that time. (Pl.'s Br. at 8). Claimant further contends that the ALJ rejected the opinion of Dr. Razavipour without taking into consideration the length of time he had treated Claimant. (*Id.*). In response, the Commissioner emphasizes that Dr. Ozturk's letter was written only to advise the DHHR that Claimant could not return to his former employment and was not intended to suggest that Claimant was entirely unable to perform any work-related activities.  In addition, the Commissioner argues that the ALJ correctly discounted the opinions of Dr. Ozturk and Dr. Razavipour because those opinions were inconsistent with the objective medical evidence.  (Def. Br. at 14-18).

20 C.F.R. §§ 404.1527(d) and 416.927(d) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded controlling

weight only if two conditions are met: (1) the opinion is supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). When a treating physician's opinion is not supported by clinical findings or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight, *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001), but must explain the reasons for discounting the opinion. 20 C.F.R. §§ 404.1527, 416.927.

Medical source statements on issues reserved to the Commissioner are treated differently than medical source opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e). In both the regulations and Social Security Ruling 96-5p, the SSA explains that opinions about whether an impairment meets or is equivalent to a Listing; a claimant's residual functional capacity; whether a claimant's RFC prevents him from doing past relevant work; how vocational factors apply; and whether a claimant is disabled or "unable to

work" are not medical opinions; instead, they are "administrative findings" which are reserved to the Commissioner. Because the final responsibility for making these findings rests with the Commissioner, treating source statements concerning those issues are never entitled to controlling weight or even special significance. "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p at 2. Treating source statements on issues reserved to the Commissioner must not be ignored; rather, they must be evaluated in context with all the evidence in the case record. The ALJ should consider the supportability of these statements and their consistency with the record as a whole. SSR 96-5p.

     1.   *Dr. Ozturk*

On January 22, 2008, Dr. Ozturk drafted a letter to DHHR in which he stated that Claimant was unable to work at that time and would "continually be monitored on a monthly basis until he is able to return to work." (Tr. at 461). The ALJ implicitly rejected Dr. Ozturk's statement on Claimant's inability to work; instead, finding that based on Dr. Ozturk's treatment notes, the opinions of the state agency physicians, and the objective medical evidence, Claimant could perform light exertional level work (Tr. at 20–21). The Court finds that the ALJ complied with the requirements of the applicable Social Security regulations by correctly assessing Dr. Ozturk's statement in view of its evidentiary significance and in relation to the objective medical findings and other data contained in the record as a whole.

Between the third and fourth steps of the sequential evaluation process, the ALJ thoroughly analyzed the medical and anecdotal evidence pertaining to Claimant's vertebrogenic disorder and explained how that evidence led to the conclusion that Claimant was capable of performing jobs in the light exertional level, even when taking into account his other individual limitations. (Tr. at 19-21). The ALJ examined objective findings or lack of findings indicative of the severity and persistence of Claimant's disorder, emphasizing that Claimant did not participate in physical therapy, did not perform home exercises, had never had surgery performed or recommended, did not use a brace or any assistive devices, and admitted to experiencing some relief with the use of pain medications. In addition, Claimant had received four epidural injections in his SI joints that apparently provided some relief, at least temporarily. The ALJ noted that requests for approval of other treatments, such as a spinal stimulator, had been rejected by Worker's Compensation. Next, the ALJ considered the anecdotal evidence and Claimant's testimony. While the ALJ believed that Claimant's symptoms caused him pain, the ALJ felt Claimant's descriptions of the intensity, persistence, and limiting effects of the pain were exaggerated. (*Id*). For example, the ALJ pointed out Claimant's assertion that he could not sit longer than 15 minutes at a time, yet displayed no observable difficulty when sitting twice that long during the administrative hearing. Similarly, Claimant complained that he could not sleep more than two hours without being awakened by pain, yet reported to one of his health care providers that he could sleep seven or eight hours when he took his prescribed medication. Specifically discussing Dr. Ozturk's records, the ALJ acknowledged Dr. Ozturk's diagnosis of lumbar radiculopathy, but observed that an MRI report purportedly supportive of that diagnosis was not found in Dr. Ozturk's records or in the remainder of the file. Claimant had a

history of normal EMG's and nerve conduction studies and no obvious neurological findings.  (Tr. at 21, 375).  In March 2008, just two months after his letter to DHHR, Dr. Ozturk recorded that Claimant could walk on his heels and toes and squat one-quarter of the way down. (Tr. at 21). On March 25, 2008, Dr. Ozturk noted that Claimant had reached maximum medical improvement and was waiting to see if Claimant would be approved for vocational rehabilitation. (Tr. at 659). Although Dr. Ozturk had stated that he did not believe Claimant could return to work *at his previous employer*, the conclusion that Claimant was unable to return to any type of work was simply not supported by Dr. Ozturk's treatment notes.  Although not specifically referenced by the ALJ, the same day that Dr. Ozturk wrote the letter to DHHR, he charted in his office notes that Claimant needed vocational rehabilitation; thus, further suggesting that Dr. Ozturk did not intend to indicate that Claimant was entirely unable to work. This notation was consistent with other records prepared by Dr. Ozturk in which he opined that with rehabilitation, Claimant could find another job. (Tr. at 335, 351, 464, 481, 513–14, 659–60).[9]

Undoubtedly, the ALJ conducted a careful examination of the relevant evidence and cited substantial evidence in the record which contradicted the unqualified assertion made by Dr. Ozturk in his letter. Claimant would like the Court to remand or reverse this case simply because the ALJ did not explicitly confirm that he discounted Dr. Ozturk's January 2008 letter. However, Claimant provides no support for her contention that the ALJ had a duty to expressly address that particular statement and explain why he rejected it, when the statement was administrative in nature rather than a medical opinion. Certainly, the ALJ was obligated to consider Dr. Ozturk's findings

---

[9] Some of these citations include Dr. Ozturk's notes prior to March 7, 2007.

and medical opinions, which the ALJ obviously did as outlined in his written decision. Moreover, the ALJ had a duty to explain the weight he gave to conflicting medical opinions, a duty with which he also complied. Even assuming that the ALJ erred by not specifically mentioning the letter, the error was harmless and does not merit reversal or remand. *See Burch v. Astrue,* 2011 WL 4025450 (W.D.N.C., July 5, 2011), *citing Camp v. Massanari,* 22 Fed.Appx. 311 (4th Cir.2001) (Claimant must show that absent error, the decision might have been different). More importantly, the objective medical evidence and the opinions of the state consultants provide substantial support for the ALJ's conclusion that Claimant's functional limitations did not prevent him from performing light or sedentary work.

      2.    *Dr. Razavipour*

Claimant's challenge to the ALJ's rejection of Dr. Razavipour's mental RFC also must fail. The ALJ explicitly addressed Dr. Razavipour's findings on the Mental Status Statement-Ability to Do Work-Related Activities (Mental) form and compared them to the treatment notes from Prestera, the objective evidence, and the findings of the state consultants. Having weighed all of the evidence, the ALJ concluded that Dr. Razavipour's RFC assessment was inconsistent with other substantial evidence and was not supported by the clinical record; therefore, he declined to find Dr. Razavipour's opinions controlling or dispositive. The ALJ correctly noted that Dr. Razavipour's treatment records did not support his conclusion that Claimant's impairments were severe. Similarly neither the remaining Prestera records, nor the consultants' opinions corroborated Dr. Razavipour's RFC findings. (*Id.*). Over the course of Claimant's treatment at Prestera, he repeatedly stated that he was feeling better, that his mood was "okay" or improving, and that he was sleeping better with medication. (Tr. at 666–70).

Claimant reported that the change in medication had helped improve his mood, that he was feeling more motivated, and was enjoying his daily routine more. (Tr. at 669). Claimant also repeatedly described experiencing positive results from a combination of his medication and psychotherapy. (Tr. at 467, 581, 586–87, 658). Dr. Razavipour personally noted sustained improvement in Claimant's GAF and opined on October 10, 2008 and again on February 12, 2009 that Claimant's major depressive disorder was "in full remission." (Tr. at 666-67). Moreover, Dr. Razavipour's notation on the RFC form that Claimant had "severe" mental impairment and limitations is inconsistent with Dr. Razavipour's last documented GAF for Claimant of 60, which reflects only moderate, bordering on mild, functional impairment. Thus, Dr. Razavipour's notes do not support his finding that Claimant was "extremely limited" across broad categories of mental functional capacity. In contrast, the Prestera records support the ALJ's determination that the severity of Claimant's mental impairments fluctuated over time with temporary exacerbations tied directly to particular stressors in Claimant's life; such as, his separation from his wife. (Tr. at 576, 583, 593, 600). The fact that the ALJ did not expressly acknowledge that Dr. Razavipour met with Claimant on five occasions while the state examiners only "briefly" met with Claimant does not change the actuality that Dr. Razavipour's RFC conclusions are not substantiated by her own treatment notes or the evidentiary record.

The ALJ reviewed the medical evidence and the reports of agency consultants and found that they confirmed Claimant's mental impairments to be mild or moderate in nature. (Tr. at 21–22). On November 28, 2007, Lisa Tate, MA, completed a clinical interview and mental status examination of Claimant. (Tr. at 455–59). Ms. Tate found that Claimant's orientation, thought processes, thought content, perception, insight,

judgment memory, recent memory, remote memory, concentration, and psychomotor behavior were all within normal limits. (Tr. at 457–58). Ms. Tate also found that Claimant's social functioning, concentration, persistence, and pace were all within normal limits. (Tr. at 459). On April 17, 2008, Timothy Saar, Ph.D, completed a Psychiatric Review Technique at the request of the Social Security Administration. (Tr. at 610–23). Dr. Saar evaluated Claimant's functional limitations and found that Claimant's functional limitations were all mild and that Claimant had experienced no episodes of extended decompensation. (Tr. at 620). Both agency consultants agreed that Claimant suffered from major depression and anxiety, but concluded that Claimant's mental impairments were not severe, that Claimant was not fully credible, and that Claimant's mental impairments caused only mild to moderate functional limitations.

Consequently, having reviewed the ALJ's decision and the evidentiary record, the Court finds that the ALJ's consideration of Dr. Razavipour's opinion was not in error. Further the Court holds that the ALJ's decision to afford Dr. Razavipour's RFC opinion limited evidentiary weight was supported by substantial evidence.

### B.    Improper Hypothetical

Claimant argues that the ALJ's hypothetical question to the vocational expert was improper. (Pl.'s Br. at 8–9). According to Claimant, the ALJ's RFC finding was inaccurate because the ALJ ignored the opinions of Claimant's treating physicians. Thus, given that the RFC was faulty, any hypothetical question that incorporated the RFC finding was inevitably flawed. As a result, the vocational expert's opinions were tainted and suspect. It is well-established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50–51 (4th Cir. 1989).

While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987).

In the present case, Claimant's argument is meritless, because the ALJ properly evaluated and incorporated the opinions of Claimant's treating physicians. The ALJ's hypothetical questions contained a well-reasoned RFC finding that accurately reflected the evidence. Furthermore, the RFC finding and, hence, the hypothetical question demonstrate that although the ALJ discounted Claimant's statements of intensity and persistence of symptoms, the ALJ fairly accommodated Claimant's alleged impairments and complaints to the extent that they were supported by the record. In light of the medical evidence before the Court and the ALJ's substantiated RFC finding, the undersigned concludes that the ALJ posed a proper hypothetical to the vocational expert.

## VIII.  **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  April 18, 2012.

Cheryl A.  Eifert
United States Magistrate Judge